# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, STEWARD MEDICAL GROUP, INC., STEWARD PGH, INC., STEWARD NSMC, INC., STEWARD CGH, INC., and STEWARD HH, INC., | ) ) ) ) ) ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2022-0289-SG |
| TENET BUSINESS SERVICES CORPORATION, TENET HEALTHCARE CORPORATION, CGH HOSPITAL, LTD., CORAL GABLES HOSPITAL, INC., HIALEAH HOSPITAL, INC., HIALEAH REAL PROPERTIES, INC., LIFEMARK HOSPITALS OF FLORIDA, INC., LIFEMARK HOSPITALS, INC., NORTH SHORE MEDICAL CENTER, INC., SUNRISE MEDICAL GROUP I, LLC, TENET FLORIDA PHYSICIAN SERVICES, LLC, TFPS IV, LLC, and SHARILEE SMITH, as Trustee for Coral Gables Hospital Land Trust Agreement Number 1001, and as Successor Trustee pursuant to The FMC Land Trust Agreement Number 1001, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 12, 2022
Date Decided: August 1, 2022

Michael A. Barlow and Adam K. Schulman, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Anthony Bongiorno and Jessica Reese of QUINN EMANUEL URQUHART & SULLIVAN, LLP, Boston, Massachusetts;

and Rollo C. Baker IV, Jared Ruocco, and Eric White, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for the Plaintiffs and Counterclaim Defendants*.

Lewis H. Lazarus, K. Tyler O'Connell, Albert J. Carroll, and Barnaby Grzaslewicz of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Stephen C. Hackney, P.C., Timothy W. Knapp, P.C., and Brendan E. Ryan, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Defendants and Counterclaim Plaintiffs.*

**GLASSCOCK, Vice Chancellor**

The Plaintiffs and Defendants are the buyers and sellers, respectively, of a group of hospitals in Florida. This Memorandum Opinion involves the Plaintiffs' request for entry of a preliminary injunction (the "PI Motion"), which in effect seeks specific performance of a contract; it would direct the Defendants[1] to continue to provide post-acquisition patient services under a service agreement (the "Transition Services Agreement" or "TSA") entered as part of the larger transaction. Like a Fabergé Egg found on the seized yacht of a Russian oligarch,[2] this equitable bauble exists within the larger framework of contractual disputes between the parties in this case.

To oversimplify the issues for clarity here, the Defendants agreed via the TSA to provide patient services—after the Plaintiffs' contractually permitted extension of the agreement—through February 1, 2023; the Plaintiffs had a duty to make monthly payments for these services; and the Plaintiffs have failed to make these payments, which contractually permits the Defendants to terminate the services, *unless* the payments may be offset by amounts due to the Plaintiffs from the Defendants. The latter provision is driving this phase of the litigation. While there are several disagreements between the parties regarding amounts due under the various

---

[1] Specifically, Defendant Tenet Business Services Corporation. *See* Proposed Order Granting Pls.' Mot. Prelim. Inj., Dkt. No. 51 ¶ 2.

[2] *See* Emily Burack, *Suspected Fabergé Egg Found on Yacht Seized from Russian Oligarch*, TOWN & COUNTRY (July 25, 2022), available at https://www.townandcountrymag.com/society/politics/a40708397/faberge-egg-russian-oligarch-yacht-2022/.

contracts involved, one is determinative of the issue currently before me: To again oversimplify, the State of Florida had a program to compensate hospitals for medical procedures for Medicaid patients, provided at below market rates. The hospitals purchased by the Plaintiffs participated in this program, the Florida Directed Payment Program (the "DPP"). The parties agreed contractually as to how the payments received from the DPP would be allocated. As the Defendants construe the contract, the Plaintiffs are holding millions of dollars in DPP funds owed to the Defendants, meaning that Plaintiffs owe more in combined DPP funds and past due TSA fees than they can offset with amounts due from the Defendants. The Plaintiffs read the contract to allocate those DPP funds to themselves, which would mean that enough offsets are available to satisfy their unpaid TSA fees. Accordingly, the Defendants have notified the Plaintiffs that they will terminate TSA services for nonpayment, as of August 10, 2022; thus the Plaintiffs' motion for preliminary injunctive relief.

In order for such a motion to prevail, a movant must demonstrate a likelihood of success on the merits, together with threatened imminent irreparable harm absent injunctive relief, and that the equities support an injunction.[3] In light of these well-known factors, the following analysis will no doubt strike the reader as odd; this is because the Defendants have agreed to waive the requirement that the movant

---

[3] *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278–79 (Del. 1989).

demonstrate likelihood of success on the merits, and to not oppose entry of an injunction, conditioned only upon this court setting a bond sufficient to ensure payment for services provided, should the entry of injunctive relief prove improvident.[4]   The Defendants point out that the Plaintiffs are in arears under the TSA and alleged that the Plaintiffs are insolvent, a separate ground permitting termination of services under the TSA.

Given that posture, most of the analysis that follows involves setting of an appropriate bond.   The bond is a requirement of equity; it represents the non-movant's sole means of recompense for an injunction improvidently granted.[5] The Defendants argue that the non-payment and alleged insolvency of the Plaintiffs support a large bond.  The Plaintiffs, for their part, point out that the parties agreed contractually that a court could act to enforce the contracts without the necessity for a bond.

Despite, as I have said, the Defendants' waiver of the Plaintiffs' proof of a reasonable probability of success on the merits, a version of that analysis must inform, I find, a proper assessment of the bond requirement.  Because I find here that the Defendants' interpretation of the contract language allocating the DPP payments is reasonable on the truncated record before me, I find it readily

---

[4] The Defendants also waive the argument that the relief sought is positive and not appropriate on a contested or incomplete record.

[5] *See Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 470 (Del. 2010).

conceivable that they will prevail ultimately on the issue of the right to terminate for nonpayment. It is appropriate, therefore, that the bond available in equity for compensation, should the injunction prove improvident, be sufficient to cover the value of the right that would in that case have been forgone: the right to terminate. A bond sufficient to that end is the monthly payment required under the contract, assuming services are consumed at the high end of those used in the months that the TSA has been in effect, payable for each month that the preliminary injunction remains in effect.[6]

My reasoning follows an examination of the factual background, below.

## I. BACKGROUND

On June 16, 2021, the parties executed an Asset Purchase Agreement ("APA") which contemplated the sale of a group of hospitals by the Defendants to the Plaintiffs (the "Sale").[7]

The TSA was executed on August 1, 2021 as part of the Sale.[8] Under the TSA, Defendant Tenet Business Services Corporation agreed to provide the Plaintiffs with certain "information technology services" related to the hospitals sold in the Sale, to "assist in the orderly transition of the operation."[9] The TSA provides

---

[6] The Plaintiffs seek a PI covering two months, with a modification after that time; to the extent the modification supports a reduction in the bond, the parties should so inform me.
[7] *See* Verified Compl., Dkt. No. 1 [hereinafter "Compl."], Ex. 1 § 2.1 [hereinafter "APA"].
[8] *See generally* Compl., Ex. 2 at 1 [hereinafter "TSA"].
[9] *Id.*

for an initial term of one year, and it grants the Plaintiffs a right to a six-month extension,[10] which they exercised.[11] The TSA is thus set to run until February 1, 2023.[12]

The TSA provides both parties the right to terminate the agreement if the other party commits a "material breach" that is not cured within thirty days of written notice of the breach:

> **Termination For Cause**. Either Party may terminate this Agreement upon written notice to the other Party if the other Party commits a material breach of this Agreement and, to the extent such breach is curable, fails to cure such breach within thirty (30) days after written notice of such breach is provided by the nonbreaching Party to the breaching Party.[13]

The TSA defines "material breach" to include a party's insolvency:

> [A] material breach of this Agreement shall include, without limitation, the breaching Party becoming insolvent or admitting in writing its insolvency or inability to pay its debts as they become due; being unable or not paying its debts as they become due . . . .[14]

The TSA also provides that the Defendants may terminate the agreement "immediately" via "written notice" "if any late payment is not fully paid by [the Plaintiffs] within thirty (30) days of the applicable due date":

[10] *Id.* § 2.1.
[11] Transmittal Aff. Michael A. Barlow, Esq. Supp. Pls.' Opening Br. Supp. Mot. Summ. J. All Claims Countercls., Dkt. No. 33 [hereinafter "Barlow Aff."], Ex. 44.
[12] *Id.*
[13] TSA § 2.3.
[14] *Id.*

> [I]f any late payment is not fully paid by Authorized User within thirty (30) days of the applicable due date, Vendor may terminate this Agreement immediately by providing written notice thereof to Authorized User[.][15]

However, if the Defendants attempt to terminate for TSA unpaid amounts, the TSA requires them to "first exhaust remedies by offsetting such unpaid amounts against amounts then due to [the Plaintiffs] under the AAPP Program . . . ."[16]

Since the Sale closed, several disputes have arisen between the parties related to payments due under the TSA and the APA. Under the Defendants' interpretation of the relevant payment provisions, they contend that the Plaintiffs owe them $18,181,770 through May 2022, which, if correct, would give them an apparent right to terminate the TSA for nonpayment.[17] Under the Plaintiffs' interpretation of those provisions, it is the Defendants who owe $16,332,877, and thus, the Defendants have no termination right.[18]

---

[15] *Id.* § 4.5.

[16] *Id.*; *see also id.* § 2.3 ("[F]or any breach arising from amounts unpaid by Authorized User under this Agreement, Vendor must first exhaust remedies by offsetting such unpaid amounts against amounts then due to Buyers under the AAPP Program."). The "AAPP Program" was a program in which, after closing, the Plaintiffs reimbursed the federal government for amounts that the federal government had advanced to the Defendants before closing. Compl. ¶ 4. The Plaintiffs are entitled under the APA to recover those reimbursements from the Defendants. *Id.* When applied against sums owed to the Plaintiff under the AAPP Program, the disputed amounts under the DPP are determinative here.

[17] Defs.' Answering Br. Opp. Pls.' Mot. Summ. J. Br. Supp. Defs.' Cross-Mot. Summ. J., Dkt. No. 43 at 51 [hereinafter "Defs.' MSJ OB"].

[18] Pls.' Opening Br. Supp. Mot. Summ. J. All Claims Countercls., Dkt. No. 33 at 44 [hereinafter "Pls.' MSJ OB"].

Although several payment provisions are at issue, the bulk of the parties' dispute concerns the allocation of distributions under the DPP. The DPP is a state-sponsored, and federally approved, program designed to address uncompensated Medicaid costs borne by Florida's hospital providers.[19]

Under the DPP, Florida established "special assessments" that it charges to participating hospitals.[20] Florida's Agency for Health Care Administration ("AHCA") then places the revenue generated from those assessments into a fund, which is matched by federal funds.[21] The combined total is then sent to "Managed Care Organizations," who in turn distribute the funds to participating hospitals "as supplemental Medicaid reimbursements" ("DPP Distributions").[22] Those DPP Distributions are "directly link[ed] . . . to utilization of inpatient and outpatient services" and "occur retroactively."[23]

To institute the DPP, on November 16, 2020, AHCA submitted an application to the federal Centers for Medicare and Medicaid Services ("CMS") for a "rating period" covering "October 1, 2020 through September 30, 2021."[24] On April 26, 2021, CMS approved a revised version of the application for the October 1, 2020 to

---

[19] Answer Countercls. Verified Compl., Dkt. No. 24 ¶ 48 [hereinafter "Countercl."].

[20] Compl. ¶ 57.

[21] Countercl. ¶¶ 50–51; Compl. ¶ 57.

[22] Countercl. ¶ 51; Compl. ¶ 57.

[23] Transmittal Aff. Barnaby Grzaslewicz, Esq. Supp. Defs.' Answering Br. Opp. Pls.' Mot. Summ. J. Br. Supp. Defs.' Cross-Mot. Summ. J., Dkt. No. 44 [hereinafter "Grzaslewicz Aff."], Ex. 4 at 5 [hereinafter "CMS Approval Letter"].

[24] *Id.* at 1.

September 30, 2021 rating period.[25]  To date, the October 1, 2020 to September 30, 2021 period is the only rating period that CMS has approved, although AHCA has submitted an application for the October 1, 2021 to September 30, 2022 rating year.[26]  That application remains pending.[27]

Beginning in October 2021, after the Sale closed, the Plaintiffs paid assessments in connection with the DPP.[28]  In the first quarter of 2022, the DPP disbursed DPP Distributions totaling approximately $53.99 million.[29]  Of that amount, the DPP disbursed approximately $49.3 million to the Plaintiffs, and $4.6 million to the Defendants.[30]

The parties dispute how those DPP Distributions should be allocated under the terms of the APA.  As explained in detail below, the APA includes provisions governing the allocation of DPP Distributions based on contractually defined "Program Year" periods in relation to when "Closing" occurs.[31]  The Defendants contend that they are entitled to approximately 10/12s of the DPP Distributions, after certain deductions, meaning that the Plaintiffs owe them approximately $27.7 million in DPP Distributions.[32]  The Plaintiffs, in contrast, argue that they are entitled

---

[25] *Id.*
[26] Grzaslewicz Aff., Ex. 6 at 1.
[27] Aff. Saumya Sutaria Supp. Defs.' Cross-Mot. Summ. J., Dkt. No. 43 ¶ 4.
[28] *See* Barlow Aff., Exs. 1–5; Aff. Sanjay Shetty Supp. Pls.' Mot. Summ. J., Dkt. No. 33 ¶¶ 5–7.
[29] *Id.* ¶¶ 5, 8–10.
[30] *Id.* ¶¶ 8, 10.
[31] *See* APA § 8.22.
[32] Defs.' MSJ OB at 21–22, 36 n.2; Grzaslewicz Aff., Ex. 37.

to the full amount of the DPP Distributions, meaning that the Defendants owe them approximately $4.6 million in DPP Distributions.[33]

Beyond the dispute regarding DPP Distributions, the parties disagree about the interpretation of several other payment provisions under the TSA and APA. These other disputed payment terms generally relate to the use of certain equipment and software, and the obligation to offset amounts due.[34] However, the amount in dispute regarding these other payment provisions is minimal compared to the dispute regarding DPP Distributions.[35] As a result, regardless of how the other payment provisions are construed, if the Defendants' interpretation of the DPP Distribution provision is correct, they are entitled to terminate the TSA, and if the Plaintiffs' interpretation is correct, the Defendants cannot terminate the TSA. Accordingly, this Memorandum Opinion, which considers preliminary relief only, focuses on the DPP Distribution provision, and does not discuss the other payment provisions at issue.

On March 25, 2022, the Plaintiffs filed a complaint seeking an order (i) declaring, among other things, that their contractual interpretation of the payment provisions is correct; and (ii) enjoining the Defendants from terminating the TSA.[36]

---

[33] Pls.' MSJ OB at 18 n.9, 19 n.10, 21, 38, 44.

[34] *See, e.g., id.*, *Argument* §§ II.A.1, 3–6; Defs.' MSJ OB, *Argument* §§ II, IV.

[35] *Compare* Pls.' MSJ OB at 44 (claiming that $16.3 million is owed to the Plaintiffs in total), *with* Defs.' MSJ OB at 51 (claiming that $27.7 million in DPP Distributions are owed to the Defendants).

[36] *See* Compl. at 46–47.

The Plaintiffs also filed a motion to expedite.[37] I granted the motion to expedite and scheduled an expedited July 12, 2022 hearing date for cross-motions for summary judgment regarding the interpretation of the relevant payment provisions.

While the parties were briefing their cross-motions for summary judgment, the Defendants sent the Plaintiffs written notice on May 27, 2022 that they were terminating the TSA.[38] The Defendants raised two grounds for termination in their letter: (i) the Plaintiffs allegedly owed, at the time, $19,607,520 under the TSA and APA, even after exhausting offsets; and (ii) the Plaintiffs are allegedly insolvent and have failed to pay their debts as they come due.[39] Although the TSA requires only thirty days' written notice before termination, the Defendants provided the Plaintiffs with seventy-five days' notice, with termination to take place on August 10, 2022.[40]

In response to the Defendants' termination letter, the Plaintiffs filed the PI Motion, seeking to temporarily enjoin the Defendants from terminating the TSA.[41] In their PI Motion, the Plaintiffs represented that they expect to be able to complete a transition of the services provided under the TSA by October 14, 2022, except for one service related to patient data.[42] Thus, the PI Motion seeks to enjoin

---

[37] *See* Pls.' Mot. Expedite, Dkt. No. 1.
[38] Transmittal Aff. Adam K. Shulman, Esq. Supp. Pls.' Reply Br. Further Supp. Mot. Summ. J., Opp. Defs.' Cross-Mot. Summ. J., and Supp. Mot. Prelim. Inj., Dkt. No. 53, Ex. 1.
[39] *Id.* at 1–3.
[40] *Id.* at 3.
[41] Pls.' Mot. Prelim. Inj., Dkt. No. 51.
[42] *See* Pls.' Br. Further Supp. Mot. Summ. J., Opp. Defs.' Cross-Mot. Summ. J., and Supp. Mot. Prelim. Inj., Dkt. No. 53 at 5, 62–63 [hereinafter "Pls.' PI OB"].

the Defendants from terminating the TSA until October 14, 2022, and to require the Defendants to continue providing the service related to patient data until February 1, 2023.[43]

On July 12, 2022, the parties presented their arguments regarding the preliminary injunction motion and the cross-motions for summary judgment, and I consider the matter submitted as of that date.

## II. ANALYSIS

### A. Legal Standards

This Memorandum Opinion addresses only the Plaintiffs' PI Motion. A preliminary injunction is a "powerful remedy" that is available only in "extraordinary circumstances."[44] To obtain a preliminary injunction, the Plaintiffs must establish the following three elements: "(1) a reasonable likelihood of success on the merits, (2) imminent, irreparable harm will result if an injunction is not granted and (3) the damage to [the] [p]laintiff if the injunction does not issue will exceed the damage to the defendants if the injunction does issue."[45] Although some showing is required with respect to each element, "there is no steadfast formula for

---

[43] *See id.*
[44] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004).
[45] *In re Cencom Cable Income Partners, L.P.*, 2000 WL 130629, at *7 (Del. Ch. Jan. 27, 2000).

the relative weight each deserves."[46]  Therefore, "a strong demonstration as to one element may serve to overcome a marginal demonstration of another."[47]

In addition to these elements, Court of Chancery Rule 65(c) provides that "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."[48]  The security is "usually a bond."[49]

*B. The Factors Required for the Relief Plaintiffs Seek Are Met by Conditional Waiver*

At oral argument, the Defendants represented that they would waive proof on the merits at this preliminary injunction phase, and not otherwise object to the entry of an order requiring them to perform services under the TSA, provided that I require the Plaintiffs to post a reasonable bond as security.  I therefore consider the bond requirement first.  Because I find that the bond sought by the Defendants is appropriate, I need not address these factors except as they relate to the bond, which I address below.

---

[46] *Alpha*, 2004 WL 2694917, at *3.
[47] *Id.*
[48] Ch. Ct. R. 65(c).
[49] *Guzzetta*, 7 A.3d at 470.

12

*C. The Bond Requirement*

The Defendants request a bond of $2.8 million per month while the preliminary injunction remains in place, through January 31, 2022.[50] According to the Defendants, this amount reflects the "high side" of what the Defendants have typically invoiced in TSA fees and expenses in previous months.[51] The Plaintiffs concede in their briefing that they expect monthly TSA fees and expenses to be approximately $2.486 million per month, going forward,[52] but they raise two objections to the Defendants' proposed bond. As explained below, I find neither persuasive.

First, the Plaintiffs note that the Defendants agreed in the APA to waive "security or bond" requirements "as a prerequisite to obtaining equitable relief."[53] But although this Court has enforced bond waivers when granting motions for

---

[50] Defs.' Response Opp. Pls.' Mot. Prelim. Inj., Dkt. No. 58 at 9–11 [hereinafter "Defs.' PI AB"].
[51] *Id.*
[52] Pls.' PI OB at 15.
[53] *See* APA § 10.14.

preliminary injunctions,[54] the existence of such a waiver does not bind the Court.[55] The security requirement is important because it allows a party wrongfully enjoined to "recover damages resulting from the injunction," which "is limited to the amount of the bond."[56]  As a result, "[a]n error in setting the bond too high thus is not serious," but "an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond."[57]  Accordingly, although the parties' agreement to waive a bond is persuasive, it is not dispositive.  Under these particular circumstances, discussed below, I find that equity requires a bond, notwithstanding the parties' agreement.

Second, the Plaintiffs contend that a $2.8 million bond is too high.[58]  The Plaintiffs correctly assert that damages for their potential breach of the TSA "is a

---

[54] *E.g.*, *Hologram, Inc. v. Caplan*, 2022 WL 117807, at *1 (Del. Ch. Jan. 10, 2022) (ORDER) ("Caplan knowingly and voluntarily agrees to waive the requirement in Rule 65(c) that Hologram post a bond in connection with a preliminary injunction granted by the Court herein.  Therefore, no bond shall be required . . . ."); *Premier Dealer Holding Co., LLC v. Moore*, 2019 WL 3936123, at *3 (Del. Ch. Aug. 20, 2019) (ORDER) ("Mr. Moore waives the requirement of [Rule 65(c)], and Premier is not required to post a bond or give security in order for the preliminary injunction to issue"); *PNEC, LLC v. Liberty Utils. (Pipeline & Transmission) Corp.*, 2018 WL 705704, at *1 (Del. Ch. Feb. 2, 2018) (ORDER) ("The bond requirement of [Rule 65(c)] is hereby waived."); *Cocam Int'l Enters. Ltd. v. Svensrud*, 2020 WL 4547384, at *3 (Del. Ch. Aug. 5, 2020) (ORDER) ("It is also ORDERED that Plaintiff Cocam need not post a bond.").

[55] *See Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *12 n.72 (Del. Ch. Mar. 27, 2014) (imposing bond "to assure [the defendant's] ability to recover damages if it turns out that the TRO was improperly issued" despite agreements that "purport[ed] to relieve [the plaintiff] of any obligation to post security"); *cf. TP Grp.–CI, Inc. v. Vetecnik*, 2016 WL 5864030, at *3 (D. Del. Oct. 6, 2016) ("inappropriate to waive the bond requirement [under the Federal Rules of Civil Procedure] despite the parties' agreement" where the "[d]efendant risks monetary loss" from the preliminary injunction).

[56] *Guzzetta*, 7 A.3d at 469.

[57] *Id.* at 470.

[58] Pls.' Reply Br. Supp. Mot. Prelim. Inj., Dkt. No. 62 at 33–34.

different issue than the amount of harm that [the Defendants] face[] from a wrongful injunction."[59] The Plaintiffs contend that if the Defendants are correct that the Plaintiffs have failed to satisfy their TSA payment obligations, "then [they] will be entitled to the full amount due, notwithstanding the issuance of the injunction."[60] Accordingly, the Plaintiffs argue that a bond that reflects monthly TSA fees would not be "tied to the losses that can be proximately caused by a wrongful injunction,"[61] as opposed to the losses caused by the Plaintiffs' breach. Instead, the Plaintiffs argue that if I set a bond, it should be at most $840,000, which purportedly reflects the contractual interest to which the Defendants would be entitled for late TSA fees during the injunction period.[62]

In considering whether to set a bond, and if so, at what amount, I first note that the Defendants have submitted some evidence that the Plaintiffs have failed to pay certain debts as they have come due. For example, the Defendants cite an eviction notice that the Plaintiffs received for failure to pay over $63,000 in rent and credit holds relating to the Plaintiffs' failure to pay six vendors.[63] I also note that the Plaintiffs do not dispute that they have incurred an arrearage of their monthly

---

[59] *See id.* at 33 (quoting *Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, 2020 WL 2551916, at *11 (Del. Ch. May 20, 2020)).
[60] *See id.* (quoting *Buckeye Partners*, 2020 WL 2551916, at *11).
[61] *See id.* (quoting *Buckeye Partners*, 2020 WL 2551916, at *11).
[62] *Id.* at 33–34.
[63] *See* Defs.' PI AB, Exs. 7–9.

15

TSA invoices.[64]  To be sure, the Plaintiffs contend that this arrearage is covered by offsets owed by the Defendants.[65]  But the Plaintiffs' failure to pay their full TSA invoices, together with the evidence that they have failed to timely pay other debts to third parties, suggests that the Defendants face some credit risk by continuing to provide TSA services to the Plaintiffs.

As to the argument that the bond can be limited to the interest on any contractual payments due, because the Defendants can satisfy any other loss from an improvidently entered injunction via contract damages separate from the bond, the Plaintiffs misunderstand, in my opinion, what the Defendants will lose if the injunction proves improvident:  the right to terminate the contract rather than take on the credit risk just described.  This was a contracted-for right of the Defendants, and to my mind supports a bond representing the value of the services themselves, not merely interest plus the (perhaps pyrrhic) right to bring a contract action, prove damages and attempt to collect them.

Moreover, and directly pertinent to the bond required, I note that it is substantially conceivable that *the Defendants* will prevail with respect to the dispute over DPP Distributions.  Again, while the Defendants have (conditionally) waived the right to contest likelihood on the merits, the relative strength of the parties'

---

[64] Pls.' MSJ OB, *Facts* § VI; Pls.' PI OB, *Argument* § VI.
[65] Pls.' MSJ OB, *Facts* § VI; Pls.' PI OB, *Argument* § VI.

contractual interpretations is relevant to the bond requirement itself, since the relative weakness of the Plaintiffs' proposed interpretation goes directly to the risk of an improvident injunction.

Section 8.22 of the APA governs the way DPP Distributions are to be allocated among the parties.[66] The allocation scheme divides DPP Distributions into three categories, based when "Closing" occurs relative to a contractually defined "Program Year."[67] First, the APA provides that DPP Distributions "relating to the Program Year in which Closing Occurs," which it deems "DPP Straddle Distributions," are prorated "on a per diem basis."[68] After certain deductions, the Defendants are entitled to the DPP Straddle Distributions prorated for the number of days in that "Program Year" "prior to and includ[ing]" the Closing Date, and the Plaintiffs are entitled to the DPP Straddle Distributions prorated for the number of days in that "Program Year" that follow the Closing Date:

> With respect to any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to the Program Year in which the Closing occurs (the "***DPP Straddle Distributions***"), . . . the Parties shall prorate such remaining amount of the DPP Straddle Distribution on a per diem basis with (i) Sellers receiving a portion of such remaining DPP Straddle Distributions based on a fraction, the numerator of which is the number of calendar days in

---

[66] *See* APA § 8.22
[67] *Id.*
[68] *Id.*

17

such Program Year that are prior to and include the Closing Date and the denominator of which is 365 and (ii) Buyers receiving a portion of such remaining DPP Straddle Distributions based on a fraction, the numerator of which is the number of calendar days in such Program Year that follow the Closing Date and the denominator of which is 365.[69]

Second, the APA provides that the DPP Distributions "relating to any Program Year after the Program Year in which Closing occurs," defined as "Post-Closing DPP Distributions," are to be distributed to the Plaintiffs in full:

> Buyers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to any Program Year after the Program Year in which the Closing occurs (the "***Post-Closing DPP Distributions***").[70]

Finally, the APA provides that DPP Distributions "relating to any Program Year prior to the Program Year in which the Closing occurs," defined as "Pre-Closing DPP Distributions," are to be distributed to the Defendants:

> Sellers shall be entitled to 100% of any reimbursement or distribution with respect to the Healthcare Business arising out of, attributable to or received in connection with the Florida Directed Payment Program and relating to any Program Year prior to the Program Year in which the Closing occurs (the "***Pre-Closing DPP Distributions***" . . .).[71]

---

[69] *Id.*
[70] *Id.*
[71] *Id.*

Thus, the allocation of the DPP Distributions depends on the definitions of "Closing" and "Program Year." The parties agree that "Closing" occurred on August 1, 2021.[72] The Asset Purchase Agreement defines "Program Year" as follows:

> For purposes of this Section 8.22, "**Program Year**" means the program year (i.e., October 1 through September 30) in which assessments are collected and payments are made with respect to the Healthcare Business in connection with the Florida Directed Payment Program.[73]

Relying on the plain language of the "Program Year" definition, the Plaintiffs contend that the DPP Distributions at issue are "Post-Closing DPP Distributions," to which they are entitled in full.[74] The Plaintiffs note that because Program Years run from October 1 through September 30, and Closing occurred on August 1, 2021, that means that the "Program Year in which the Closing occurs" ended on September 30, 2021.[75] The Plaintiffs further note that "assessments we[re] collected and payments we[re] made" with respect to the DPP Distributions only beginning in October 2021—after the "Program Year in which Closing occurs."[76] Because "'Program Year' means the program year . . . in which assessments are collected and payments are made . . . in connection with the [DPP]," it follows, say the Plaintiffs, that the

---

[72] Compl. ¶ 60; Countercl. ¶ 134.
[73] APA § 8.22.
[74] *E.g.*, Pls.' MSJ OB, *Argument* § II.A.2.
[75] *Id.*
[76] *E.g.*, *id.*

DPP Distributions *all* relate to the "Program Year after the Program Year in which the Closing occurs."[77]

The Defendants agree that the "Program Year in which the Closing occurs" ended on September 30, 2021, before any "assessments we[re] collected and payments we[re] made" with respect to the DPP Distributions.[78] But they contend that this literal reading of the Program Year definition ignores the context of the DPP, which is a reimbursement program.[79] The Defendants assert that the DPP Distributions at issue were designed to reimburse hospitals for services provided during the October 1, 2020 to September 30, 2021 period approved by the federal CMS.[80] Accordingly, the Defendants argue that the DPP Distributions relate to "Program Year in which the Closing occurs," even though they were assessed and distributed after that year ended, because they relate to services provided during that year.[81] The Defendants thus argue that the prepositional phrase "in which" in the Program Year definition should more properly be read as "for which":

> "[W]hen the definition of 'Program Year' is read with an eye toward how the DPP actually functions, it plainly means 'the program year (i.e. October 1 through September 30) *for* which assessments are collected and

---

[77] *Id.*
[78] Defs.' MSJ OB, *Argument* § I.
[79] *Id.* § I.B.
[80] *Id.*
[81] *Id.* § I.

20

payments are made with respect to the Healthcare Business in connection with the [DPP]."[82]

That is, the Defendants contend that under the Program Year definition, assessments and distributions are considered "in" the DPP "program year" during which the reimbursed services were provided—not "in" the year during which they were assessed and distributed.[83]

At first blush, the Plaintiffs' reading appears to be more persuasive, because it comports with the plain language of the "Program Year" definition—at least when that definition is read in isolation. In particular, the APA defines Program Years to run from October 1 through September 30.[84] Therefore, because Closing occurred on August 1, 2021,[85] the "Program Year in which Closing occur[ed]" ran from October 1, 2020 through September 30, 2021. And because "'Program Year' means the program year . . . in which assessments are collected and payments are made . . . in connection with the [DPP],"[86] it follows that the DPP Distributions, which were assessed and distributed after September 30, 2021,[87] relate to "the Program Year after the Program Year in which Closing occur[ed]."

---

[82] *Id.* at 35–36 (emphasis in original).
[83] *Id.* at 36.
[84] APA § 8.22.
[85] *See supra* note 72 and accompanying text.
[86] APA § 8.22 (emphasis omitted).
[87] *See supra* notes 28–29 and accompanying text.

21

But this reading breaks down when viewed in the context of the broader APA and the DPP itself. First, the APA's definition of Program Year borrows terminology from, and explicitly references, the DPP. For example, both the DPP and the APA's definition of Program Year and the DPP use the lower-case phrase "program year." The DPP uses the lower case phrase "program year" when referring to the annual rating periods for which it provides reimbursements.[88] And the APA's definition of "Program Year" references the lower case "program year (i.e. October 1 through September 30) . . . in connection with the [DPP]."[89] It is thus reasonable to interpret the lower case "program year . . . in connection with the [DPP]" in the APA to have the same meaning as the phrase "program year" as it is used by the DPP. The DPP has received federal approval for only one program year, running from October 1, 2020 through September 30, 2021—the "Program Year in which Closing occurs."[90] Therefore, if the phrase "program year" has the same meaning in the APA as in the DPP, the DPP Distributions would necessarily "relate to the Program Year in which Closing occurs," because that is the only "program year" for which distributions have been paid.

Furthermore, if the Plaintiffs are correct that "Program Year" is the "program year" during which "assessments are collected *and* payments are made," then the

---

[88] *See, e.g.*, CMS Approval Letter at 8.

[89] APA § 8.22.

[90] *See supra* notes 26–27 and accompanying text.

Program Year definition fails to contemplate situations where assessments are made in one DPP "program year," and corresponding distributions are made in the next. For example, if assessments were collected on September 30, 2021, and corresponding distributions were made the next day, on October 1, 2021, the Program Year definition fails to contemplate that scenario under the Plaintiffs' reading.[91] In contrast, under the Defendants' reading, those distributions would refer to the year in which the reimbursed services were provided, regardless of when the assessments and distributions were timed.

Finally, the Plaintiffs' reading of the Program Year definition is unworkable in context to the rest of the APA's DPP Distribution provision. No assessments were collected and no payments were made during the October 1, 2020 through September 30, 2021 time period. Therefore, if the Plaintiffs are correct that Program Years are defined by when "assessments are collected and payments are made," that would mean that there was no "Program Year in which Closing occurs." And if there is no "Program Year in which Closing occurs" (i.e. DPP Straddle Distributions), then there can be no "Program Year after the Program Year in which Closing occurs" (i.e. Post-Closing DPP Distributions), and there can be no "Program

---

[91] Dr. Sanjay Shetty, who verified the Plaintiffs' complaint, acknowledged this in a deposition. *See* Grzaslewicz Aff., Ex. 2 at 249:24-250:10 ("[Q.] What would the result be, in your mind, if there were DPP assessments collected on September 15th of 2021 but distributions were not made until January of 2022? . . . [A.] . . . I would say that was a situation that doesn't appear to have been contemplated in the language. . . .").

Year prior to the Program Year in which Closing occurs" (i.e. Pre-Closing DPP Distributions).

Indeed, for there to be a "Program Year in which Closing occurs" under Plaintiffs' reading, Closing would have had to be October 1, 2021 or later. And for there to be a "Program Year prior to the Program Year in which Closing occurs" under Plaintiffs' reading, Closing would have had to be October 1, 2022 or later. But the parties negotiated a Termination Date of October 1, 2021, after which either party could terminate the APA if Closing had not yet occurred.[92] The APA allows for an extension of the Termination Date only until December 1, 2021.[93] Thus, under the Plaintiffs' reading, the "DPP Straddle Distributions" could only exist if the parties closed the APA on the Termination Date or exercised an extension. And "Pre-Closing DPP Distributions" could only exist if the parties blew the Outside Date by a full year. The existence of a Termination Date suggests that the parties intended to close the Sale by that date. It is unlikely that the parties negotiated a bespoke allocation of DPP Distributions that would only be relevant if they failed to do so by a full year.

Notably, the parties knew this when they signed the APA. Indeed, AHCA's application to the federal CMS—which was approved on April 26, 2021, before the

---

[92] APA § 8.1(a)(iv).
[93] Id.

parties signed the APA on June 16, 2021—provided for a "rating period" of October 1, 2020 through September 30, 2021, with distributions to "occur retroactively."[94] At oral argument, counsel for the Plaintiffs conceded that when the parties signed the APA, they knew that October 1, 2021 was the earliest date on which DPP Distributions would be made.

Accordingly, I find it readily conceivable, based on the record here and the pertinent contract language, that the Defendants' interpretation of the DPP Distribution provision is correct: The DPP Distributions likely relate to "the Program Year in which Closing occur[ed]"; if so, they are DPP Straddle Distributions to be allocated on a prorated basis between the Defendants and the Plaintiffs. This interpretation is consistent with the structure of the DPP, which is expressly referenced in the Program Year definition, and it is the interpretation that is workable in the context of the broader APA.

The Plaintiffs do not dispute that if the DPP Distributions at issue are DPP Straddle Distributions, the Defendants are entitled to approximately 10/12s of them under the terms of the APA, or $27.7 million, which would entitle them to terminate the TSA. Accordingly, I find a non-trivial possibility that the Defendants are entitled to terminate the TSA.

---

[94] CMS Approval Letter at 1, 5.

25

Because of the likelihood that the Defendants will establish a right to terminate the TSA, and because, if so, an order causing them to continue to provide TSA services forces the Defendants to accept a credit risk they had contracted to avoid, I find it appropriate to impose a $2.8 million bond per month while the preliminary injunction remains in place—that is, for an additional two months, until October 14, 2022.[95] This amount represents the high end of what the Defendants have invoiced in previous months for TSA fees and expenses and is thus consistent with our Supreme Court's instructions that "the court should 'err on the high side' in setting a bond" for preliminary relief.[96]

The Defendants have agreed to waive the traditional elements of a preliminary injunction, so long as I impose a $2.8 million monthly bond during the period of the preliminary injunction. Accordingly, the Plaintiffs' PI Motion will be granted once they satisfy the bond requirement by paying $2.8 million for the first month's bond,

---

[95] The Plaintiffs seek some injunctive relief beyond two months, but that will require different relief and likely a lower bond; the parties should inform me how they want to proceed with respect to relief beyond two months.

[96] See Guzzetta, 7 A.3d at 470.

26

followed by an additional $2.8 million for the second month before commencement of the second month's services.

*    *    *

The parties have also cross-moved for summary judgment on the contractual interpretation of the payment terms on an expedited basis. Because this Memorandum Opinion granting the Plaintiffs' preliminary injunction may resolve the need for expedited relief, the parties should confer and inform me if they seek an expedited decision on the cross-motions for summary judgment.

## III. CONCLUSION

For the foregoing reasons, the Plaintiffs' PI Motion is GRANTED, subject to the Plaintiffs' satisfaction of a $2.8 million monthly surety bond. The parties should confer and submit a form of order consistent with this Memorandum Opinion.